## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| C.S., individually and on behalf of all other similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, a New York corporation,<br><br>*Defendant*. | Case No._____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff C.S., individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant The Trustees of Columbia University in the City of New York, doing business as Columbia University, and alleges as follows upon personal knowledge as to herself and, as to all other matters, upon information and belief.

### INTRODUCTION

> *"Never forget the 7th of October. That will happen not one more time, not five more times, not 10, 100, 1,000, 10,000. The 7th of October is going to be every day for you."* [1]
>
> - Masked protester threatening Jewish students at Columbia University (April 18, 2024).

1.      Universities are the foundational bedrock of our society, providing critical forums for open and rigorous debates on major issues of the day. Engaging in free and spirited debate is a uniquely American value and a significant part of the education university students receive as they learn to analyze a range of viewpoints, develop positions, and then advocate for them. These

---

[1]      The "7th of October" refers to October 7, 2023, the deadliest day for Jews since the Holocaust, when Hamas—a U.S. designated terrorist organization—invaded the State of Israel, massacred 1,200 Jews, and captured more than 200 civilian hostages.

debates are so critical to our society that they are constitutionally protected. This commitment to free speech and robust discourse is what this country was built on and is central to our identity.

2.      But when forums turn violent and hostile, genuine debate becomes impossible, and the American bedrock principle of free speech is fundamentally compromised. This is exactly what is happening at Columbia University.

3.      Since October 7th, there has been a surge of intense social and political debates across the country about the State of Israel. While the Israel-Palestine conflict has long been a contentious issue, the recent round of debates centers on Israel's response to Hamas' October 7th attack, the appropriateness of Israel's military actions against Hamas, the humanitarian crisis in Gaza, and the U.S.'s financial and military support for Israel. These debates often make people profoundly uncomfortable, and opinions are deeply divided. However, this kind of discourse is a cornerstone of American society, where differing viewpoints can be discussed openly, even when protestors use inflammatory language like "Fuck Israel" or make other derogatory remarks. Despite the discomfort these debates can cause, they are part of the fabric of a democratic society that values free speech and the unfettered exchange of ideas.

4.      Many of the individuals at Columbia are exercising their constitutionally protected right to protest and express their views about Israel, aiming to effect changes they believe in. However, within these groups, there's a subset of protesters who have gone well beyond simply engaging in free speech and who have different and menacing goals. This extreme element is not just expressing dissent; they have and are continuing to commit acts of violence, they are intimidating and harassing Jewish students and faculty members, they are inciting demonstrators to engage in hate speech and also commit acts of violence, which has been taking place, and they have even called for terrorist attacks against the United States and

2

the State of Israel. All of these acts have been calculated to disrupt the normal functioning of Columbia and to overshadow the voices of those engaging in constitutionally protected speech and protest.

5.      On April 18, 2024, a group of these extreme demonstrators at Columbia began occupying a centrally located section of campus they call the "Liberated Zone" where they erected a "Gaza Solidarity Encampment" with more than 60 tents and have actively blocked Jewish and other students—by force, harassment, and threats of violence—who do not share their views from traversing the campus and attending classes. Despite Columbia's repeated requests for the encampment to be removed, they have thus far refused and instead have called for the encampment to grow.

6.      Since its formation, the encampment has been the center of round-the-clock harassment of Jewish students, who have been punched, shoved, spat upon, blocked from attending classes and moving freely about campus, and targeted by pro-terrorist hate speech—both verbal and in written form on massive banners and signs—with statements such as: "Death to the Jews"; "Long live Hamas"; "Globalize the Intifada[2]"; "there is only one solution, Intifada revolution" (invoking Hitler's "final solution" of killing all Jews); "Hamas we love you. We support your rockets too"; "Red, black, green, and white, we support Hamas' fight"; "It is right to rebel, Al-Qassam,[3] give them hell"; and "go back to Poland" (a not-too-veiled reference to the concentration camps where Jews were mass murdered during the Holocaust).

---

[2]      "Intifada" is an Arabic word that refers to a series of brutal terrorist attacks against Israeli civilians between 1987-1993 and 2000-2005 through various forms of violence including mass shootings and suicide bombings.

[3]      "Al-Qassam" refers to the military wing of Hamas. The Al-Qassam Brigades are known for launching violent attacks against Israeli civilians, including on October 7th. The group has been sanctioned by numerous governments around the world, including most recently the European Union, which found that on October 7th, Al-Qassam's fighters "committed widespread sexual and gender-based violence in a systematic manner, using it as a weapon of war."

7.      These extreme demonstrators are not engaging in constitutionally protected free speech. Instead, they are openly inciting violence against Jewish students. A clear example is the Columbia student shown in Figure 1, below, holding a sign with an arrow pointing at Jewish Columbia students that are waving American and Israeli flags. The sign reads "Al-Qasam's next targets," implying that these students should be the next victims of a massacre by Hamas' military wing:



(**Figure 1.**)

This provocative display is emblematic of the rhetoric being used to threaten and intimidate Jewish students on campus.

8.      Columbia has done nothing to curb this outrageous behavior or meaningfully discipline those responsible, and the administration's inaction and willingness to capitulate to the demands of this extremist element of demonstrators have fanned the flames of antisemitism

across campus.

9.    Indeed, despite its supposed commitment to diversity, equity, and inclusion, Columbia has allowed a small group of fringe demonstrators to target Jewish students and faculty with harassment, hate speech and violence for the sole reason that they are (or appear to be) Jewish. Columbia's inaction and willingness to allow for such vile conduct is antithetical to fostering an environment of diversity, equity, and inclusion. For instance, when one of these extreme demonstrators noticed a female student approaching the encampment wearing a Star of David necklace, he proclaimed, "Attention, everyone! We have Zionists who have entered the camp!" He then ordered more than 100 protesters to lock arms and instructed, "So that we can push them out of the camp, one step forward! Another step forward!" More than 100 students marched in unison towards a lone Jewish student until she had no choice but to leave.[4] A video[5] emerged a few days later of the same encampment leader declaring, "Zionists[6] do not deserve to live."

10.    This incident made clear that while this extreme element claims to be demonstrating against Israeli oppression, they are simply targeting students for being Jewish. Their snap reaction to block an approaching student who appears to be Jewish from joining the encampment demonstrates their goal is not to engage in discussion or debate about the Israel-Hamas war or plight of the Palestinian people, but instead to intimidate and marginalize

---

[4]    Video of this disturbing incident can be seen here: https://x.com/chalavyishmael/status/1782260652477649104.

[5]    The video posted by the encampment leader can be seen here: https://x.com/ShelleyGldschmt/status/1783560978774520255.

[6]    When someone uses "Zionists" in this way, they are often using it as a code word for Jewish people. This terminology enables them to promote discrimination and hatred against Jews while maintaining plausible deniability that they are engaged in antisemitism. Even if the speaker understands the difference between a Zionist and a Jew, they are frequently inciting action from people who might believe that all Jews are Zionists.

Columbia's Jewish students.

11.    Columbia's President, Minouche Shafik, initially seemed to take a firm stance against the escalating chaos on campus by issuing an ultimatum to these extreme demonstrators who are occupying the encampment. She warned that if they did not vacate the encampment by 12:00 a.m. on April 24, the police would be called to intervene and restore order. However, when the deadline passed without compliance, she announced that she was "negotiating" with those that have engaged in this outrageous and constitutionally unprotected conduct and opted instead to not enforce the ultimatum.

12.    Although Columbia publicly broadcasted that it was eager to negotiate with these individuals, it made no public nor, on information and belief, private effort to engage with the Jewish students who have been displaced. This sends a clear message about Columbia's priorities. In fact, Columbia's administration ultimately agreed to allow both these extreme demonstrators and the encampment to remain in place, and in a shocking twist, decided to bar the only Jewish professor speaking out on behalf of the Jewish students from entering campus, citing safety concerns.

13.    Columbia has in no uncertain terms announced that the university is not safe for its Jewish students. But rather than clear the encampment, the administration decided to take the extraordinary step of shifting to a "hybrid" model of education for the remainder of the academic year, where students that don't feel safe enough to attend class in person can view the class online. This absurd shift makes no attempt to solve the safety problem on campus, and at the same time, creates two very different educational experiences for Jewish and non-Jewish students. The vast majority of the student population, including these extreme demonstrators, get to attend classes in person, take tests in person, communicate with professors in person, and

otherwise take advantage of the campus.

14.     The Jewish students, on the other hand, get a second-class education where they are relegated to their homes to attend classes virtually, stripped of the opportunity to interact meaningfully with other students and faculty and sit for examinations with their peers. This policy shift is a clear admission that the campus is not simply experiencing a protest movement, which has happened to universities across the country for decades, but instead, has become a place that is too dangerous for Columbia's Jewish students to receive the education they were promised.

15.     The segregation of Jewish students is a dangerous development that can quickly escalate into more severe acts of violence and discrimination, underscoring the critical importance of addressing and combating such behavior at its early stages.

16.     Plaintiff C.S. brings this lawsuit to hold Columbia accountable for failing to provide a safe educational environment for its students. Plaintiff also seeks an emergency injunction, through a motion filed contemporaneously with this complaint, requiring Columbia to enforce its Statement of Ethical Conduct and Administrative Code of Conduct to provide safe and secure access to education free from harassment and discrimination so that Plaintiff and the Class members can safely complete the semester in person with the rest of the student body.

**PARTIES**

17.     Plaintiff C.S. is a ███████████ and a Jewish student in her second year at ████████████████████████████████████████████████.

18.     Defendant The Trustees of Columbia University in the City of New York is the legal name of Columbia University, a private university based in New York, New York.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class (defined below) is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that section apply.

20.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the wrongful conduct at issue in this case occurred in this District.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District.

**FACTS**

**I.      Jewish Students Are Unsafe at Columbia And Their Education Has Been Significantly Disrupted.**

22.     On April 18, 2024, protesters at Columbia gathered to form the so-called "Gaza Solidarity Encampment" on a central area of campus known as South Lawn West which they have renamed the "Liberated Zone." The stated goal of the protest is to force Columbia to financially divest from companies and institutions that profit from alleged "Israeli apartheid, genocide and occupation in Palestine." The protesters have erected tents and have pledged to occupy the Liberated Zone until their demands are met. Within a matter of hours, the protest escalated into a threatening environment that endangered and continues to endanger the safety of students, particularly those who identify as Jewish or have connections to Israel.

23.     The encampment has become a focal point for aggressive and violent behavior. Documented incidents include verbal threats, physical intimidation, and even assaults on students. Jewish students have been subjected to derogatory remarks, with chants like "Go back to Poland," invoking antisemitic tropes of returning to the concentration camps and promoting

discrimination. More disturbingly, direct threats have been made, including references to the October 7th Hamas terror attacks, with individuals declaring, "The 7th of October is going to be every day for you." Such statements create a climate of fear and hostility and have no place in a civilized society, let alone an academic setting where young adults are trying to learn and grow as individuals.

24. The presence of the encampment and the resulting unrest has significantly disrupted the educational experience for many students. Classes have been interrupted by loud protests, and some students have been physically blocked from attending lectures and other academic activities.

25. Columbia's response was to give the encampment an ultimatum to vacate by midnight on April 24th, with a threat to involve the police if they refused. However, when the protesters ignored the ultimatum, President Shafik relented and did not follow through with her promise to remove them.

## II. Columbia Admits That Its Campus Is No Longer Safe For Jewish Students And Has Effectively Cancelled In-Person Classes for Jews for the Remainder of the Semester.

26. Instead of taking action against the students, faculty, and outside individuals who are harassing and intimidating Jewish students, Columbia's administration has taken the unprecedented step of shifting to a hybrid (i.e., online optional) model of education for the remainder of the academic year. This drastic move signals the administration's inability to control the encampment and maintain campus security, further highlighting the severity of the disruption to education and student life. By implementing a hybrid learning approach, the university fails to address the underlying safety concerns while creating a stark divide in the educational experiences of Jewish and non-Jewish students.

27. Columbia's decision to cancel mandatory in-person learning underscores the

severity of the safety concerns on campus. By shifting to a hybrid model, Columbia acknowledges that it cannot guarantee and has taken no or, at best, insufficient steps to ensure the safety of its Jewish students. This response reflects a troubling reality: the campus environment has deteriorated to the point where the risk of violence and harassment is too high to maintain normal academic operations.

28.     Shifting to hybrid learning significantly disrupts the educational experience for thousands of students. In-person interactions with professors and peers are a fundamental part of university life, contributing to more than just academic knowledge. These interactions foster a sense of community, allowing students to build meaningful relationships, network for future career opportunities, and receive immediate feedback and guidance. The move to hybrid learning not only diminishes these essential aspects of education but also isolates Jewish students from the rich collaborative environment that a physical campus offers.

29.     Additionally, hybrid learning can exacerbate feelings of loneliness and being disconnected. Students lose out on the spontaneous conversations in hallways, the shared experiences in classrooms, and the social events that are crucial for personal growth. The lack of face-to-face engagement with faculty and peers can lead to a reduced sense of belonging, making it harder for students to stay motivated and engaged in their studies.

30.     This shift to hybrid learning also sends a troubling message: that violence and threats are effective in disrupting the educational experience and will not be met with immediate consequences if at all. By moving classes online instead of addressing the root causes of campus unrest, the university risks normalizing dangerous and disruptive behavior. It creates a precedent that safety concerns can lead to significant changes in the educational structure, allowing those willing to engage in aggressive behavior to gain leverage over academic institutions. Ultimately,

this impacts the quality of education and deprives students of the holistic university experience they enrolled to be part of. It also has the potential of devaluing the degrees that these students have worked hard to obtain, which in turn, may limit their job prospects and career paths after graduation.

31. As part of the shift to hybrid learning, Columbia also announced that students can choose to take exams online if they do not feel safe on campus. Online examinations present several challenges and disadvantages for students. First, online exams can lead to increased stress and anxiety due to technical issues such as unstable internet connections, software glitches, or device malfunctions, which can disrupt and even prevent the test-taking process. Second, online exams often lack the same level of academic integrity as in-person exams, with students having greater access to unauthorized resources or the ability to collaborate, compromising the fairness of the assessments, potentially undermining the credibility of students' academic performance. Indeed, prospective graduate schools and employers may view remote test scores with skepticism, as they did during the COVID-19 pandemic, raising concerns about the validity and reliability of the evaluations, which likewise could ultimately diminish the value of students' grades and impact their future academic and professional opportunities.

32. Moreover, there's something inherently comforting about taking exams with others in a classroom setting. It's a communal experience where students can gauge the pace and reactions of their peers, picking up on cues like whether others are also struggling or breezing through the test. This shared environment fosters a sense of solidarity and support, with students offering encouragement to one another before and after the exam. The shift to online optional examinations removes this communal feeling, isolating students and depriving them of the reassuring presence of their classmates during a stressful time. Overall, these factors contribute

to a less reliable and more stressful examination process, impacting students' academic outcomes, learning experiences, and, ultimately, prospects for future employment.

33. In addition to these issues, some Jewish students were unable to complete their final examinations altogether and were forced to extend their semester into the summer to complete their courses.

34. It should be noted that on February 12, 2024, the Committee on Education and the Workforce of the U.S. House of Representatives opened an investigation into Columbia's "response to antisemitism and its failure to protect Jewish students," citing "grave concerns regarding the inadequacy of Columbia's response."

### III. Columbia Breached, and Continues to Breach, Its Policies And Promises To Provide Students With A Safe Learning Environment.

35. Columbia has clear policies and guidelines that promise to provide—in addition to a legal obligation to provide—a safe learning environment for all students, regardless of their race, ethnicity or religion. These policies prohibit harassment, discrimination, and violence, and they commit the University to taking prompt and effective action against such behavior. In addition, Columbia's mission and vision statements underscore the importance of diversity, inclusion, and a community where all students can learn and thrive without fear. It even warns that "lack of awareness or understanding of University policies does not excuse a violation," and tells new students that "Upon accepting admission to Columbia University, [they] are expected to become familiar with and uphold the University's core values in such a way that they observe and abide by the policies of the University."

36. Despite these policies and promises, Columbia has failed to maintain a safe learning environment free from discrimination and harassment. The ongoing incidents of violence and harassment on campus directly violate the university's own rules and commitments,

including:

(a) "to providing a learning, living, and working environment free from unlawful discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members." (Non-discrimination Policy);

(b) "to providing a learning, living, and working environment free from prohibited discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. Each individual has the right to work and learn in a professional atmosphere that promotes equal employment opportunities and prohibits discrimination and harassment." (EOAA Policies and Procedures);

(c) "an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study." (Rules of University Conduct);

(d) "an obligation to ensure that all members of our community can participate in their academic pursuits without fear for their safety. *That is our highest priority.*" (emphasis added) (Student Event Policy);

(e) prohibiting conduct that "disrupts a University function or renders its continuation impossible" (Rules of University Conduct, Section 443);

(f) an obligation that if "the President decides that a demonstration poses a clear and present danger to persons, property, *or the substantial functioning of any division of the University*, he or she *shall take* all necessary steps to secure the cooperation of external authorities to bring about the end of the disruption." (emphasis added) (Rules of University Conduct);

(g) prohibiting conduct that interferes with its mission to provide a "safe and healthy educational environment," including "Disruptive Behavior," which is defined as "behavior that interferes with the academic mission of the University or compromises the well-being of the University community. This includes but is not limited to behavior which is disruptive to the classroom, laboratory, or University community." (Rules of University Conduct);

(h) "Reaffirm[ing]—amidst a concerning rise in hate and intimidation nationally and internationally—our expectations for student conduct" and that "All students deserve the opportunity to live and learn in peace. Our aim is to maintain our academic mission, abide by our principles, safeguard the well-being of all members of the community, and act in accord with long-established rules even in this fraught moment." (Guidance and Expectations on Student Conduct); and

(i) prohibiting conduct that "seriously affects the interests of the University or the position of the member within the University community, or occurs in close proximity to University premises and is connected to violative conduct on University premises," including: "Interference with or disruption of the regular

operations and activities of the University" and "Unauthorized access to or occupation of nonpublic areas on University premises." (Rules for the Maintenance of Public Order.)

37.     By failing to provide its students with a safe learning environment, Columbia has violated each of these policies.

38.     The promise of personal security on campus is a necessary predicate to delivering nearly all of the other specific on-campus services and facilities that Columbia promises in return for a tuition payment: when students cannot be protected on campus, they cannot, for example, enter the library, go to the gym, receive face-to-face counseling from Columbia advisers, attend in-person class, sit for in-person examinations, or otherwise access the "wide variety of services and tools [that] are available" through University Services "to assist students . . . with . . . learning, housing, health, and other concerns."

39.     These services and tools include critical resources for students, such as: the in-person offices of Counseling and Psychological Services ("Counseling and Psychological Services offers short-term individual counseling, referrals for longer-term therapy, student-life support groups, medication consultation, and emergency consultation"); the Berick Center for Student Advising, which "brings together, under one roof, general academic advising, Academic Success Programs, the Columbia Undergraduate Scholars Program (CUSP), and the Office of Preprofessional Advising"; the in-person offices for Sexual Violence Response, which "provides trauma-informed, confidential support, and prevention programs focused on ending gender and power-based violence"; and a food pantry for students in need. The health and counseling services are provided in return for specifically earmarked fees that come in addition to tuition and are mandatory and non-refundable. All of these services are housed in the same building (Lerner Hall), which is located directly next to the site of the encampment.

40.     Columbia's failure to provide students with a safe campus also necessarily means

that it has broken its promise to provide students with these additional on-campus services.

## FACTS SPECIFIC TO PLAINTIFF C.S.

41.     Plaintiff C.S. is in her second year at Columbia. Plaintiff is an openly Jewish student that experienced numerous instances of harassment and intimidation on campus since October 7th. Though Plaintiff was at times uncomfortable on campus, she was generally able to attend classes on campus without issue, and for the most part, felt safe in her educational environment.

42.     However, when the encampment was erected on April 18th, the level of hostility on campus escalated dramatically, creating a sense of fear and insecurity for Plaintiff. The aggressive protests and intimidating behavior near the encampment made her fearful of harassment and even physical harm.

43.     The hostile climate on campus significantly impacted Plaintiff's education and ability to complete coursework. For example, Plaintiff planned to finish a ███████████ project in the ███████████ on April 21. The ███████████ is located on campus and the project could not have been completed elsewhere. But in an effort to contain the growing protests on campus, Columbia shut down all but the main entrance, which is located at 116th Street and Amsterdam Avenue. Unfortunately, a large demonstration was taking place at the main entrance and there were numerous reports that some protesters were harassing, threatening, and in some cases, shoving, Jewish students that attempted to access campus. Plaintiff contacted Columbia's Public Safety department ███████████████████, but was told that there was no way to arrange for safe passage to the ███████████ that day. As a result, Plaintiff was unable to complete her final exam project, which was a critical part of her ███████████ coursework.

44.     When Columbia shifted to a hybrid learning model, Plaintiff opted to attend

remotely, as she felt unsafe attending classes in person, despite the significant impact it had on her performance during final examinations. For instance, one of Plaintiff's courses required her to ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████.

45.     Not only did the shift to hybrid learning diminish Plaintiff's academic performance, but it left her feeling excluded and marginalized from her educational environment and her university more generally.

46.     Had Plaintiff known that Columbia would not provide a safe educational environment, she would not have chosen to enroll at or pay tuition to Columbia.

## CLASS ALLEGATIONS

47.     **Class Definition**: Plaintiff C.S. brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of herself and a Class defined as follows:

> All current students at Columbia University who have switched to online learning on or around April 24, 2024.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and

Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

48.     **Numerosity**: The exact number of members of the Class is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. Tens of thousands of students are enrolled at Columbia University. Ultimately, members of the Class will be identified through Defendant's records.

49.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

> (a) Whether Defendant promised to provide students with a safe learning environment; and
>
> (b) Whether Defendant breached that promise.

50.     **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class in that Plaintiff and the members of the Class sustained damages arising out of Defendant's uniform wrongful conduct.

51.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class. In fact, Class Counsel are uniquely able to prosecute this case given their deep experience representing vulnerable groups. *See, e.g.*, *Doe v. Meta Platforms, Inc.*,

2022-cv-00051 (N.D. Cal.) (representing members of the Rohingya community, a Muslim minority in Myanmar in a first-of-its-kind lawsuit alleging Meta prioritized anti-Rohingya hate speech on the Facebook platform and fueling the genocide); *Ali v. Bitsmedia*, 23-CH-09478 (Cir. Ct. Cook Cty.) (representing users of the mobile app, MuslimPro, which assists users in finding the qibla, the direction of Mecca for prayer alleging that defendant leveraged users' location data to compile detailed dossiers of the movements of its millions of Muslim users and sold them to data brokers, including government contractors).

52.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or laws applicable only to Plaintiff. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

53.    **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual

litigation, it would still not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

**FIRST CAUSE OF ACTION**
**Breach of Contract**
**(<u>On Behalf of Plaintiff and the Class</u>)**

54.　　Plaintiff incorporates the foregoing allegations as if fully set forth herein.

55.　　New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of student handbooks, university bulletins, regulations, codes, policies, and procedures become part of that contract.

56.　　At all relevant times, a contractual relationship existed between Columbia and Plaintiff by virtue of her enrollment at Columbia and payment of her tuition.

57.　　Despite its stated policies and promises, Columbia has failed to maintain a safe learning environment. The ongoing incidents of violence and harassment on campus violate the university's commitments to providing a safe, secure, and inclusive space for all students. Columbia's Non-Discrimination Policy emphasizes the importance of a nurturing community free from unlawful discrimination and harassment. The Rules of University Conduct assure students they can continue their academic pursuits without fear for their safety, while the Student Event Policy explicitly states that safety is the highest priority. Additionally, these rules prohibit disruptive behavior that interferes with the academic mission and authorize the university to take necessary steps to address any disruption of the university's functioning.

58.     Campus safety was an essential term of the contract between Plaintiff and the Class and Columbia. Students take commitments to campus safety seriously when deciding whether to attend (i.e., contract with) a university, and universities appeal to prospective students by emphasizing safety and security on campus. Columbia specifically highlights its commitment to creating a safe and inclusive environment in its promotional materials, policies, and student handbooks. This emphasis on safety indicates that both parties intended campus safety to be an essential term of the student-university contract. By choosing Columbia, Plaintiff and the Class bargained for a safe learning environment where they could pursue their studies safely and without fear of harassment or violence on campus.

59.     By allowing the above described hateful, menacing, and violent behavior, and failing to enforce these policies, Columbia has failed to provide a safe educational environment and therefore breached its contractual obligations.

60.     Furthermore, Columbia's decision to shift to an online optional learning model deprived Plaintiff of the full in-person educational experience promised under the terms of her enrollment and constitute an additional breach of contract. Plaintiff reasonably expected to participate in in-person classes, engage in face-to-face interactions with professors and peers, and benefit from the collaborative and supportive environment of a physical campus. Columbia's failure to deliver on these expectations constitutes a material breach of its contractual obligations.

61.     Had Plaintiff known that Columbia would not provide an in-person educational environment free of harassment, Plaintiff would not have chosen to enroll at or pay tuition to Columbia.

62.     As a direct, proximate, and foreseeable consequence of the foregoing breaches,

Plaintiff has been damaged and continues to sustain substantial damage in amounts to be determined at trial.

63.     Accordingly, Plaintiff demands that Columbia take immediate steps to restore safety and security on campus, including by enforcing its policies and restoring the in-person educational environment promised under the terms of the contract.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff C.S., on behalf of herself and the Class, respectfully requests that this Court enter an order:

A.  Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as class representative of the Class, and appointing his counsel as Class Counsel;

B.  Declaring that Columbia's actions, as described above, constitute breach of contract;

C.  Awarding injunctive and other equitable relief as described above and as necessary to protect the interests of the Class;

D.  Awarding Plaintiff and the Class compensatory and punitive damages in amounts to be determined at trial;

E.  Awarding Plaintiff and the Class their reasonable attorneys' fees, costs, and other litigation expenses;

F.  Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

G.  Awarding such other and further relief as equity and justice may require.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial for all issues so triable.

Respectfully submitted,

C.S., individually and on
behalf of all others similarly situated,

Dated: April 29, 2024

By: /s/ Carrie Goldberg
      *One of Plaintiff's Attorneys*

Jay Edelson*
jedelson@edelson.com
Ari J. Scharg*
ascharg@edelson.com
David I. Mindell*
dmindell@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.234.5342

*Admission *pro hac vice* to be sought

Carrie Goldberg
carrie@cagoldberglaw.com
C.A. GOLDBERG, PLLC
16 Court Street, 33rd Floor
Brooklyn, New York 11241
Tel: 646.666.8908