**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| C.S., individually and on behalf of all other similarly situated, | Case No. 1:24-CV-03232 |
| *Plaintiff*, | **MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, a New York corporation, | |
| *Defendant*. | |

## TABLE OF CONTENTS

INTRODUCTION AND FACTUAL BACKGROUND ............................................................1

LEGAL STANDARD ...........................................................................................................3

ARGUMENT ........................................................................................................................4

    I.       Plaintiff and the Putative Class are Likely to Succeed on the Merits. ...............5

    II.      Without the TRO, the Putative Class Will Suffer Imminent and Irreparable Harm from Columbia's Failure to Provide a Safe, In-Person Learning Environment. .......................................................................................................9

    III.     The Balance of the Equities Tips Decidedly in Favor of the Plaintiff. ............14

    IV.     The Public Interest Weighs in Favor of Granting the TRO. ...........................15

    V.      The Court Should Not Require Plaintiff to Post a Bond. ................................16

CONCLUSION ...................................................................................................................17

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................3

**United States Circuit Court of Appeals Cases**

*Bullock v. U.S.*,
    265 F.2d 683 (6th Cir. 1959) ..........................................................................10

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)..........................................................................4, 5, 9

*CRP/Extell Parcel I, L.P. v. Cuomo*,
    394 Fed. App'x 779 (2d Cir. 2010)..................................................................13

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004)..............................................................................6

*Garcia v. Yonkers Sch. Dist.*,
    561 F.3d 97 (2d Cir. 2009)................................................................................4

*Mastrio v. Sebelius*,
    768 F.3d 116 (2d Cir. 2014)..........................................................................4, 9

*Moreno-Godoy v. Kartagener*,
    7 F.4th 78 (2d Cir. 2021) ..................................................................................8

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
    633 F.3d 81 (2d Cir. 2011)................................................................................6

*Process Am., Inc. v. Cynergy Holdings, LLC*,
    839 F.3d 125 (2d Cir. 2016)..............................................................................8

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)................................................................................9

*United States v. Turner*,
    720 F.3d 411 (2d Cir. 2013)............................................................................16

**United States District Court Cases**

*Cottonreader v. Johnson*,
    252 F. Supp. 492 (M.D. Ala. 1966) ..........................................................11, 16

*Dakota Access, LLC v. Archambault*,
  No. 1:16-CV-296, 2016 WL 4734334 (D.N.D. Aug. 16, 2016)........................10

*Eastman Kodak Co. v. Collins Ink Corp.*,
  821 F. Supp. 2d 582 (W.D.N.Y. 2011)...............................................................17

*Free Country Ltd v. Drennen*,
  235 F. Supp. 3d 559 (S.D.N.Y. 2016) ........................................................14, 15

*In re Columbia Tuition Refund Action*,
  523 F. Supp. 3d 414 (S.D.N.Y. 2021) .................................................................6

*Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*,
  157 F. Supp. 3d 352 (S.D.N.Y. 2016) .................................................................8

*Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*,
  908 F. Supp. 1180 (W.D.N.Y. 1995)...................................................................4

*Nat'l Coal. on Black Civic Participation v. Wohl*,
  498 F. Supp. 3d 457 (S.D.N.Y. 2020) .................................................................9

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010) ...............................................................16

*Novio v. New York Acad. of Art*,
  317 F. Supp. 3d 803 (S.D.N.Y. 2018) .................................................................7

*Rex Medical L.P. v. Angiotech Pharms. (US), Inc.*,
  754 F. Supp. 2d 616 (S.D.N.Y. 2010) ...............................................................15

*Ross v. Disare*,
  500 F. Supp. 928 (S.D.N.Y. 1977) ....................................................................12

*Snyder on Behalf of Snyder v. Farnsworth*,
  896 F. Supp. 96 (N.D.N.Y. 1995).......................................................................12

*Spencer v. Nigrelli*,
  648 F. Supp. 3d 451 (W.D.N.Y. 2022)...............................................................15

**State Court Cases**

*Regents of Univ. of California v. Superior Ct.*,
  413 P.3d 656 (Cal. 2018).....................................................................................11

**Rules**

Fed. R. Civ. P. 65 .................................................................................................................16

**Miscellaneous Authority**

Columbia College, *2023-2024 Bulletin: Fees, Expenses, and Financial Aid*,
https://bulletin.columbia.edu/columbia-college/fees-expenses-financial-aid/ (last visited
Apr. 28, 2024) ......................................................................................................................8

Columbia University Public Safety, *Safety Escort Program*,
https://publicsafety.columbia.edu/safetyescorts (last visited Apr. 28, 2024) ...............................14

Jessica Bryant, *Campus Safety a Factor for Most in College Choice: Survey*, BESTCOLLEGES,
(Sep. 7, 2022), https://www.bestcolleges.com/research/campus-safety-
survey/#:~:text=In%20a%20new%20BestColleges%20survey,for%20their%20safety%
20on%20campus ..................................................................................................................7

Matt Egan, *134 Israeli Students at Columbia Urge Officials to Protect Them: 'We Fear for Our
Lives,'* CNN (Apr. 26, 2024, 11:47 AM EST) https://www.cnn.com/business/live-
news/columbia-university-palestine-protests-04-26-24/h_5786bce511bd3585a942ca
507d7ed4fa..........................................................................................................................10

Office of the University Registrar, *Academic Calendar*,
https://www.registrar.columbia.edu/event/academic-calendar (last visited Apr. 28, 2024)............3

## INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff C.S., on behalf of both herself and a putative class of fellow students, urges the Court to enter a temporary restraining order ("TRO") requiring Defendant Columbia University ("Defendant" or "Columbia" or "the University") to abide by its own policies and ensure the safety of students on campus. The preliminary relief requested in the proposed TRO is both straightforward and feasible. Plaintiff and the putative class simply ask that Columbia provide (1) safe passage for members of the putative class between University dormitories, classroom buildings, library buildings, and administrative buildings during school hours (7:30am to 6:30pm), (2) safe passage for these students to return their dormitories in the evening (6:30pm to 1:00am), and (3) a security escort where necessary.

This preliminary relief is necessary because of a disturbing tide of antisemitic harassment, intimidation, and violence at Columbia. On April 18, 2024, a mixed group of students and outside demonstrators occupied (and after being initially disbursed, reoccupied) a centrally located lawn on the University's main campus, erecting dozens of tents. (Complaint ("Compl.") ¶¶ 5, 22-25.) Many of these students are exercising their entirely valid right to protest the actions of the state of Israel in its current war with Hamas, and Columbia's connection to Israel. (*Id.* ¶¶ 3-4.) However, the actions of a subset of the demonstrators reveal a broader, violent animus toward Jews in general and Columbia's Jewish students in particular. The most extreme demonstrators have chanted violent threats like "Death to Jews," and "Go back to Poland," invoking the concentration camps of the Holocaust. (*Id.* ¶ 6.) They have punched, shoved, and spat on Jewish students and other students who do not share their views. (*Id.* ¶¶ 5-7.) They have actively prevented Jewish students (and students who merely appear Jewish) from attending class, entering the library, and otherwise accessing Columbia's main campus. (*Id.* ¶¶ 5,

7, 9, 22, 23, 38.) A video, widely shared online, depicts one student leader of the encampment declaring that "Zionists do not deserve to live." (*Id.* ¶ 9.)

Columbia has numerous policies prohibiting harassment, discrimination, and violence which commit the University to an explicit "obligation to ensure that all members of our community can participate in their academic pursuits without fear for their safety."  (*Id.* ¶ 36 (quoting Columbia's Student Event Policy, and collecting other examples).) But despite these express commitments, Columbia has failed to restrain the extreme and dangerous element that embedded themselves among the lawful protestors. Columbia's Administration initially ordered the demonstrators to vacate the encampment by midnight on April 24. (*Id.* ¶ 11.) That deadline came and went with no consequences, while Columbia's President announced that she was "negotiating" with the encampment's leaders. (*Id.*) Ultimately, rather than clearing the encampment (or taking other steps to make the physical campus safer), the University announced that it would shift to a hybrid model of instruction, in which students who do not feel safe enough to travel to campus may attend classes online. (*Id.* ¶¶ 12-13.)

As a result of this policy, students who are endangered by the disorder on campus—particularly Jewish students like Plaintiff—are deprived of the in-person educational opportunities which their peers can still enjoy. (*Id.* ¶¶ 13-14.) Inability to safely traverse the campus precludes live classes, in-person exams, and face-to-face meetings with professors and fellow students. (*Id.* ¶¶ 28-31.)  Plaintiff and similarly situated students are also denied access to many other on-campus services and facilities which Columbia specifically promises in return for tuition and earmarked mandatory fees. (*Id.* ¶¶ 38-39.) That includes access to libraries, laboratories, gymnasiums, and other student services on main campus—including the offices of Columbia's academic advisors and psychological counselors, housed in a building directly

abutting the encampment. (*Id.* ¶¶ 37-40.) Columbia purports to offer security escorts for students to safely traverse campus and the surrounding area; however, when Plaintiff requested an escort to ████████████████████████████████████, an administrator informed her that Public Safety would not escort her, claiming that it could not arrange safe passage. (*Id.* ¶ 43.) Less than two weeks remain in the semester, with finals scheduled to begin on May 3.[1]

There should be no ambiguity regarding the relief sought in this memorandum and the accompanying complaint. Plaintiff is not seeking to silence the legitimate and lawful protests that are taking place at Columbia. Indeed, protests are an essential contribution to university life, even when they're uncomfortable. Rather, Plaintiff merely seeks relief from Columbia's lack of enforcement of its own policies, which is endangering the putative class by permitting a small subset of protestors to threaten, harass, bully, and intimidate students, especially those who appear to be or identify as Jewish or have connections to the State of Israel. Columbia has already made the promises, and enacted the policies, that obligate it to protect all of its students—including its Jewish students. The preliminary relief sought by Plaintiff would merely restore that *status quo* before a critical semester slips away. For the reasons described below, Plaintiff respectfully requests that the Court grant the proposed TRO filed concurrently with this Memorandum and schedule a hearing for a preliminary injunction.

## LEGAL STANDARD

A plaintiff seeking a TRO "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). In the Second Circuit, courts evaluate irreparable harm and

---

[1] Office of the University Registrar, *Academic Calendar*, https://www.registrar.columbia.edu/event/academic-calendar (last visited Apr. 28, 2024).

the likelihood of ultimate success on a sliding scale: "when the injury that allegedly will result if the restraining order is denied is very grave, less of a showing [of likely success] by the applicant is required than if the injury would be slight." *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1180, 1187 (W.D.N.Y. 1995); *see Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

The purpose of a TRO is to preserve the *status quo* until the court "has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009). However, "[p]reserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action[.]" *Mastrio v. Sebelius*, 768 F.3d 116, 120-21 (2d Cir. 2014). The decision to grant a TRO "rests in the sound discretion of the district court[.]" *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

## ARGUMENT

Plaintiff's request for a TRO satisfies each of these elements. First, Plaintiff and the putative class are likely to succeed on the merits. Columbia has breached the most material of all its contractual obligations: providing students with a safe campus to learn and live in. Second, without a TRO compelling Columbia to deliver the safe learning environment it explicitly promised, Plaintiff and the putative class will face imminent and irreparable harm on two fronts: (i) an immediate threat of antisemitic hate speech, harassment, and violence, and (ii) (while less grievous but no less irreparable) losing the university experience that they bargained for when they committed themselves to Columbia. Third, the balance of the equities tips decidedly in favor of the Plaintiff. While Columbia faces, at most, additional security costs to comply with the TRO, the students in the putative class face catastrophic threats of violence and discrimination from the University's continued inaction. Fourth, the TRO furthers the public interest. The public

4

benefits from students being permitted safe passage on Columbia's campus, and requiring the University to protect students from physical violence will not diminish any protestor's First Amendment rights. Fifth, the Court should not require Plaintiff to post a bond.

The Court should grant the TRO, both to protect Columbia's students from imminent threats to their physical safety, and to give Plaintiff and the putative class the benefit of their bargain with the University.

## I.      Plaintiff and the Putative Class are Likely to Succeed on the Merits.

To obtain a TRO, the movant must show "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation," provided the balance of hardships tips "decidedly" in the movant's favor. *Citigroup*, 598 F.3d at 35 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).  "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.*

Here, Plaintiff and the putative class *are* likely to show that Columbia breached its contractual obligation to provide a safe campus. In the alternative, in light of the hardships faced by the putative class in the current campus climate, the Court could readily find that Plaintiff has at least raised "serious questions" going to the merits.

Plaintiff will likely demonstrate that Columbia breached specific contractual promises to provide a safe, in-person campus. To prevail on a breach of contract claim under New York law, a plaintiff must show: "(1) the existence of an agreement, (2) adequate performance of the

contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

It is indisputable that a contractual agreement exists between Plaintiff and Columbia, and that Plaintiff has adequately performed her half of the bargain. "Under New York law, it is well established that the relationship between an institution of higher education and its students is 'contractual in nature.'" *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414 (S.D.N.Y. 2021) (quoting *Prusack v. State*, 498 N.Y.S.2d 455, 456 (N.Y. App. Div. 1986)). Plaintiff and the putative class have satisfied their contractual obligations by paying tuition, "satisfying the university's academic requirements and complying with its procedures." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (quotations omitted).

Columbia, by contrast, has breached the terms of its contract with Plaintiff and the putative class. The rights and obligations "contained in the university's bulletins, circulars and regulations made available to the student[ ] become a part of this contract." *In re Columbia Tuition*, 523 F. Supp. 3d at 421 (quoting *Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (N.Y. App. Div. 1987)). Thus, students can make out a breach of contract claim "to the extent that the students plausibly allege that their University violated specific contractual promises for particular services or access to facilities." *Id.* at 419-20.

Columbia's "bulletins, circulars, and regulations" make a specific and repeated contractual promise to protect students' physical safety on campus. (*See* Compl. ¶ 36 (identifying nine specific promises made by the University to ensure safety on campus and protect students from harassment by other students).) The Rules of University Conduct, for example, declare Columbia's "obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their

ability to teach and to study." (*Id.*) The Student Event Policy similarly enunciates "an obligation to ensure that all members of our community can participate in their academic pursuits without fear for their safety." (*Id.*) Columbia has manifestly defaulted on this promise. Because of Columbia's failure to enforce its policies against violence and harassment, students—and in particular Jewish students—cannot traverse the main campus without risking an antisemitic assault. (Compl. ¶¶ 5-7, 9, 23.) Indeed, the University's move to a hybrid instruction model amounts to an admission that it cannot guarantee the physical safety of Jewish students on its campus.

The University will likely argue that its promises of safety were "general statements of policy" or "broad pronouncements of ... compliance with existing anti-discrimination laws" which "do not fall under the umbrella of a school's promises for 'specified services' upon which a breach of contract claim may rest." *Novio v. New York Acad. of Art*, 317 F. Supp. 3d 803, 811 (S.D.N.Y. 2018) (internal citations and quotations omitted). But that argument is disingenuous at best. Columbia's guarantees of student safety were not articulated as vague aspirations, but as definite "obligation[s]"—and even "our highest priority." (Compl. ¶¶ 36, 57.) That is no accident. Surveys of prospective college students routinely show that universities' commitments to student safety rank among the most important considerations in college choice.[2] Plaintiff and the putative class certainly had a right to take Columbia's commitments to safety seriously when they chose to attend the school and pay tuition. It would negate the intent of the parties if Columbia could entice prospective students by promising a safe campus—then wave away those

---

[2] *See, e.g.*, Jessica Bryant, *Campus Safety a Factor for Most in College Choice: Survey*, BESTCOLLEGES, (Sep. 7, 2022), https://www.bestcolleges.com/research/campus-safety-survey/#:~:text=In%20a%20new%20BestColleges%20survey,for%20their%20safety%20on%20campus ("The majority of current and prospective college students say they considered campus safety when making their school choice.").

promises as mere throat-clearing when the University fails to perform. *See Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 157 F. Supp. 3d 352, 365 (S.D.N.Y. 2016) ("Under New York law, an implied contract . . . is derived from the presumed intention of the parties as indicated by their conduct.") (internal quotations omitted), *aff'd*, 850 Fed. App'x 38 (2d Cir. 2021). In fact, the promise of personal security on campus is a necessary predicate to delivering nearly all of the other specific services and facilities that Columbia promises in return for tuition, activities fees, and health fees: when students cannot be protected on the University's main campus, they cannot enter the library, go to the gym, attend in-person class, sit for in-person examinations, or get face-to-face counseling from Columbia advisers. (Compl. ¶¶ 38, 39.)

Finally, Plaintiff and the putative class have suffered damages because of Columbia's breach. Under New York law, the plaintiff need only show a "stable foundation for a reasonable estimate" of damages. *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 81 (2d Cir. 2021). Columbia's in-person tuition and fees—over $68,000 for undergraduates[3]—provide such a foundation. The inability of Plaintiff and the putative class to participate fully in campus life and safely access the services they have already paid for, even for a portion of the semester, denies them the full benefit of their bargain and inflicts a compensable economic harm. To be restored to the position they would be in had Columbia performed, Plaintiff and the putative class are entitled to general damages representing some proportion of that tuition. The exact amount can be calculated later. *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (noting that once "the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the wrongdoer.") (internal quotations omitted).

---

[3] *See* Columbia College, *2023-2024 Bulletin: Fees, Expenses, and Financial Aid*, https://bulletin.columbia.edu/columbia-college/fees-expenses-financial-aid/ (last visited Apr. 28, 2024).

Plaintiff and the putative class can thus satisfy each element of their breach of contract claim against Columbia and for that reason are likely to prevail on the merits. But in the alternative, Plaintiff can still obtain a TRO by showing "sufficiently serious questions going to the merits to make them a fair ground for litigation," because (as detailed further below) the balance of hardships tips "decidedly" in her favor. *Citigroup*, 598 F.3d at 35; *see also Mastrio*, 768 F.3d at 120 ("[t]he standard for granting [a TRO] requires a finding of immediate and irreparable injury but not a specific determination as to the merits.") (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 (2d Cir. 1994)). Plaintiff's allegations regarding Columbia's troubling conduct clearly raise serious questions going to the merits of her contract claim, and satisfy the requirements for a TRO.

## II.    Without the TRO, the Putative Class Will Suffer Imminent and Irreparable Harm from Columbia's Failure to Provide a Safe, In-Person Learning Environment.

"To demonstrate irreparable harm, the movant must show 'an injury that is neither remote nor speculative, but actual and imminent.'" *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). The district court should "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (internal quotations omitted). Here, Columbia's failure to provide a safe learning environment inflicts two irreparable harms on students: (1) a grave threat of harassment, hate speech, and physical violence, and (2) a severe degradation in the quality of their university education this semester. Neither of these injuries can be redressed by money damages if Plaintiff ultimately prevails on the merits.

First, physical menace from an unruly mob is emphatically an "irreparable harm," posing the gravest of risks to Plaintiff and the putative class. As the Complaint explains, students who appear to be or identify as Jewish passing near the protests have been shoved, punched, spat on, physically intimidated, and threatened with violence, including chants of "Death to the Jews" and "go back to Poland" (a reference to Nazi concentration camps where Jews were mass murdered during the Holocaust). (Compl. ¶¶ 6, 23.) The aggressive and intimidating behavior of the protestors left Plaintiff C.S. "fearful of harassment and even physical harm." (*Id.* ¶ 42.) As one group of Israeli students wrote to Columbia's administration: "We are afraid to attend classes [and] feel threatened on campus . . . . We fear for our lives."[4]

It hardly requires a legal citation to show that having to go about your daily business in fear of your life constitutes an irreparable harm. But, of course, courts *do* hold that. *See Dakota Access, LLC v. Archambault*, No. 1:16-CV-296, 2016 WL 4734334, at *5 (D.N.D. Aug. 16, 2016) (granting TRO because forcing plaintiff to "continue its activities under threat of physical violence" from protestors would constitute irreparable harm). Similarly, in a school integration case, one TRO petition described hostile segregationists "picketing at the school with large and threatening crowds continuously keeping [Black] students from the school, [and] an attack being made" on one Black student. *Bullock v. U.S.*, 265 F.2d 683, 690 (6th Cir. 1959). The court had no difficulty concluding that this constituted an "allegation of immediate and irreparable injury." *Id.* Plaintiff and the putative class face an eerily similar physical threat.

Columbia may contend that it is not responsible for the acts of third-party protestors. But the law does not permit Columbia to wash its hands so easily. Notably, courts grant TROs that

---

[4] *See* Matt Egan, *134 Israeli Students at Columbia Urge Officials to Protect Them: 'We Fear for Our Lives,'* CNN (Apr. 26, 2024, 11:47 AM EST) https://www.cnn.com/business/live-news/columbia-university-palestine-protests-04-26-24/h_5786bce511bd3585a942ca507d7ed4fa.

require the police and local governments to protect individuals seeking to exercise their rights in the face of violent third parties—and the government does not have the contractual responsibilities that Columbia does. In *Cottonreader v. Johnson*, for example, African-American plaintiffs sought to picket for civil rights in Alabama. 252 F. Supp. 492, 496 (M.D. Ala. 1966). The court found that police and the local government had failed to protect these lawful protestors, by permitting "white citizens to intimidate, threaten and assault these plaintiffs and the members of their class." *Id.* at 497. Accordingly, the judge granted a TRO restraining the local authorities from "[a]llowing dissident elements to gather" for the purpose of "assaulting, threatening or intimidating" the law-abiding plaintiffs. *Id.* at 499.

Here, Columbia promised repeatedly—in a bevy of rules, bulletins, and binding administrative codes—that it would provide a safe campus for all students. (*See* Compl. ¶ 36.) The University in no uncertain terms admits its "obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study." (*Id.*) Columbia's abject failure to fulfill this contractual promise by restraining violent demonstrators—who are trespassing on University property—constitutes an irreparable harm in itself. As the Supreme Court of California recently noted, "universities have a special relationship with their students and a duty to protect them from foreseeable violence during curricular activities." *Regents of Univ. of California v. Superior Ct.*, 413 P.3d 656, 660 (Cal. 2018). While that observation came in the context of a duty in tort, it is even more applicable to a contractual duty to students that the University has voluntarily assumed in the most explicit possible terms. The Administration's shift to a "hybrid" instructional model (where students who feel unsafe can attend class virtually) does not remedy this threat. Many students reside on or near campus—in the vicinity of the protests—and

11

students will need to access libraries and laboratories in person even if class sessions and exams are conducted virtually.

Second, Columbia's failure to maintain order on campus, and its capitulation to remote instruction (or at least, remote instruction for students too concerned for their safety to attend in-person class) irreparably harms the quality of students' education. A Jewish student who stays home might preserve her physical safety—but at an immense cost to her university experience. Fearing violence and harassment if she ventures onto campus, that student is effectively barred from the library or the laboratory, from making in-person connections with professors and peers, and from using amenities (like gyms and dining halls) for which she has already paid. In a cramped student dormitory, she may well lack the quiet space required to attend virtual class or take virtual exams. This is not a choice she should have to make.

For similar reasons, in the secondary school context, courts in this circuit have recognized that the inability to attend school in person constitutes an irreparable harm properly redressed by a TRO. *See Snyder on Behalf of Snyder v. Farnsworth*, 896 F. Supp. 96, 98 (N.D.N.Y. 1995) ("Removing Carly from school and placing her in a home schooling environment could certainly constitute sufficient irreparable harm to justify issuance of a temporary restraining order."); *Ross v. Disare*, 500 F. Supp. 928, 934 n.7 (S.D.N.Y. 1977) (holding that home instruction "does not represent an educational experience sufficiently similar to in-school instruction to eliminate the possibility of irreparable harm present" when students are unduly barred from school facilities). While university students differ from high school students in key respects, the underlying point is the same. A sudden and unwarranted shift away from in-person instruction degrades the "educational experience" and constitutes an irreparable harm.

Plaintiff C.S., a Jewish student, has faced these harms personally. █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

C.S. asked the administration for an escort from Columbia Public Safety, but was informed by an

administrator that Public Safety could not provide safe passage. (*Id.*) ███████████████

█████████████████████████████████████████████

██████████

       ████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ Without the relief

requested in the TRO—that is, safe passage to campus—C.S. and students like her will continue

to face imminent threats of physical harm, as well as a diminished (and marginalized) academic

experience at a critical time in the semester.

       Finally, Columbia is likely to argue that because Plaintiff and the putative class bring

claims for breach of contract, they are seeking to recover economic losses that cannot be

redressed by a TRO. Not so. While "an injury compensable by money damages is insufficient to

establish irreparable harm," this "does not mean that a party at risk of suffering a monetary loss

may never receive injunctive relief." *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 Fed. App'x 779,

781 (2d Cir. 2010). Rather, the party need only demonstrate that without the injunctive relief

requested, the party is *also* "likely to suffer damage that cannot be rectified by financial compensation." *Id.* Here, no amount of money can "rectify" a violent antisemitic assault, or recreate the formative experiences of an in-person education. Moreover, semesters are short. Less than a week remains until finals. Plaintiff and the putative class need the expeditious, preliminary relief of the TRO to obtain what they were promised—a safe, in-person learning environment—during this crucial window. *See id.* ("we have upheld an award of injunctive relief where a movant claimed money damages that were hard to measure plus irreparable harm").

III.    **The Balance of the Equities Tips Decidedly in Favor of the Plaintiff.**

The party seeking a TRO must show that "the balance of hardships tips in the moving party's favor." *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). Here, that balance tips decidedly in favor of the Plaintiff. Without the meaningful protection of Columbia—not only their university but in many instances their landlord—Plaintiff and the putative class face daily threats of violence, harassment, hate speech, intimidation, and obstruction of their studies. (*See, e.g.*, Compl. ¶¶ 6, 9, 23, 42.)

By contrast, granting a TRO requiring Columbia to ensure safe passage for these students would merely restore the *status quo*. In the context of a TRO, the "status quo" refers to "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio*, 768 F. 3d at 120 (quotations omitted) (citing *Black's Law Dictionary* 1410 (6th ed. 1990)). Plaintiff and the putative class are simply asking for relief that would enjoin Columbia to implement its existing policies and ensure the level of safety that prevailed before the events of the preceding months. In fact, Columbia *already* purports to offer a walking safety escort "any time when requested, seven days a week" in and around main campus.[5] The TRO would merely oblige the

---

[5] Columbia University Public Safety, *Safety Escort Program*, https://publicsafety.columbia.edu/safetyescorts (last visited Apr. 28, 2024).

University to fulfill this existing promise. ██████████████████████████████

████████████████████████████

Columbia might suggest that this will impose a hardship, in the form of additional security costs, to protect Plaintiff and the putative class on campus. However, this is merely an argument "that if [defendant] is required to comply with the terms of an Agreement that it entered into advisedly and voluntarily, it will be damaged," and as such is entitled to no consideration. *See Rex Medical L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010) ("being forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of 'damage' that is compensable at law").

There is no comparison between the threats faced by Plaintiff and the putative class, and the marginal cost of extra security for a University with a multi-billion dollar endowment. The equities tip decidedly in Plaintiff's favor.

## IV.   The Public Interest Weighs in Favor of Granting the TRO.

A TRO movant must show "that the public interest is not disserved by the relief granted." *Free Country*, 235 F. Supp. 3d at 565. Plaintiff can easily make that showing. At the most basic level, "[t]he public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense." *Rex Medical*, 754 F.Supp.2d at 627. That is even truer here, where Columbia's contractual obligations require it to uphold public order and ensure the safety of thousands of students. *See Spencer v. Nigrelli*, 648 F. Supp. 3d 451, 470 (W.D.N.Y. 2022) (noting that a TRO can serve the public interest by enhancing the "sense of []safety" of "law-abiding responsible citizens") (quoting *Antonyuk v. Bruen*, 624 F. Supp. 3d 210, 260 (N.D.N.Y. 2022)), *aff'd sub nom. Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023). Protecting Columbia students upholds, not contravenes the public interest.

Columbia may suggest that granting the TRO could impinge on First Amendment activity in the public square. That is dead wrong. Plaintiff and the putative class have been crystal clear: they do not want the University to prohibit *any* lawful protest whatsoever, and instead simply want the ability to attend school. Plaintiff is not even asking Columbia to clear the encampment; rather, she and the putative class only seek safe passage *around* it. The Supreme Court has held clearly that injunctions ensuring safe passage of vulnerable citizens passing near protestors are not unlawful prior restraints on free speech. *See Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 380-81 (1997). The Second Circuit has repeatedly found that true threats of violence (even "conditional and inexplicit" ones) are not protected by the First Amendment. *United States v. Turner*, 720 F.3d 411, 424 (2d Cir. 2013) (collecting examples). And it has been "clearly established" for decades that district courts have the equitable power to enjoin dangerous and illegal conduct committed in the course of otherwise lawful protests. *Cottonreader*, 252 F. Supp. at 499. Here, the Court's use of its equitable power to issue such a TRO would only further the public's interest in First-Amendment-protected debate, by requiring Columbia to protect students from unlawful and speech-chilling threats of violence.

## V.     The Court Should Not Require Plaintiff to Post a Bond.

If the Court grants Plaintiff's request for a TRO, it should not require Plaintiff to post a bond. *See* Fed. R. Civ. P. 65(c) (providing that the party seeking a TRO shall give security "in an amount that the court considers proper" in case it is later necessary to make the restrained party whole). "It is well-settled that a district court has 'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm'" for the restrained party. *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010) (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)).

Here, for the reasons described above, Columbia can show no harm or likelihood of harm from being required to comply with its contractual obligations. "All that this injunction does is require [the defendant] to continue to perform under the contract, as it has been doing for years." *Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590-91 (W.D.N.Y. 2011) (finding no likelihood of harm to the restrained party and declining to require a bond). In the alternative, should the Court require a bond, it should be in a nominal amount.

## CONCLUSION

For the foregoing reasons, Plaintiff and the putative class respectfully request that the Court (1) grant the proposed TRO submitted with this Memorandum, and (2) schedule a hearing for a preliminary injunction.

Respectfully submitted,

**C.S.**, individually and on behalf of all others similarly situated,

Dated: April 29, 2024

By: /s/ Carrie Goldberg
      *One of Plaintiff's Attorneys*

Carrie Goldberg
carrie@cagoldberglaw.com
C.A. GOLDBERG, PLLC
16 Court Street, 33rd Floor
Brooklyn, New York 11241
Tel: 646.666.8908

Jay Edelson*
jedelson@edelson.com
Ari J. Scharg*
ascharg@edelson.com
David I. Mindell*
dmindell@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654

17

Tel: 312.589.6370

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.234.5342

*Admission *pro hac vice* to be sought